# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

Nº 09-CR-168 (JFB)

UNITED STATES OF AMERICA,

versus

MICHAEL ROMANO, ET AL.,

Defendants.

**MEMORANDUM AND ORDER**
May 3, 2012

JOSEPH F. BIANCO, District Judge:

On June 13, 2011, defendants Michael Romano and William Kearney (collectively "defendants") were convicted, after a jury trial, of one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

On July 29, 2011, defendants renewed their motion for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, that was previously made at trial. In the alternative, defendants moved for a new trial pursuant to Federal Rule of Criminal Procedure 33(a). In their motion for a judgment of acquittal, defendants argue the following: (1) the Court should not have permitted the testimony of the government's expert witness, Anthony Swiatek (hereinafter "Swiatek"); (2) an exhibit reflecting coin grade and value was improperly admitted at trial; and (3) there was a constructive amendment or prejudicial variance to the indictment. Defendants also argue that these alleged errors warrant a new trial.

For the reasons set forth below, as well as orally on the record during the trial, the Court denies defendants' motion for judgment of acquittal and defendants' motion for a new trial in their entirety.[1]

## I. BACKGROUND

The grand jury returned a second superseding indictment (the "Superseding Indictment") against defendants on November 10, 2010 in two counts, including conspiracy to commit mail and wire fraud and conspiracy to commit money laundering. The Superseding Indictment charged that, between 1990 and 2008, defendants operated three telemarketing coin

---

[1] This Memorandum and Opinion also supplements the Court's oral ruling on May 4, 2011, denying the defendants' pre-trial *Daubert* motion to preclude expert testimony.

companies that "falsely informed the customers that the Benjamin Franklin half-dollars being offered for sale were [of the grade] MS-64+ or better and that the proof Benjamin Franklin half-dollars being offered for sale were MS-67, when actually the condition of the Benjamin Franklin half-dollars and proof half-dollars was of a lesser quality." (Sec. Sup. Ind. ¶ 11-12.) The Superseding Indictment also alleged that once a customer purchased a roll or rolls of the Benjamin Franklin half-dollars, a more senior salesperson contacted the customer and offered to sell gold or silver coins; the defendants and those acting at their direction encouraged customers to continue purchasing gold or silver coins until they had completed a set. (*Id.* ¶ 13.) The Superseding Indictment further alleged that the defendants and those acting at their direction "falsely told the customers that the Subject Companies[2] knew of other purchasers who had sold similar gold or silver coin sets for a profit" and "falsely told the customers that the Subject Companies would assist the customers with the sale of the gold or silver coins or, alternatively, that a salesperson would sell the coins on the customers' behalf at a coin show." (*Id.*) According to the Superseding Indictment, the defendants and those acting at their direction also "falsely told the customers that the Subject Companies employed a number of in-house graders, and made false statements about the background and training of the in-house graders purportedly employed by the Subject Companies." (*Id.*) The Superseding Indictment also alleged that "defendants and those acting at their direction misrepresented the grade and value of the Benjamin Franklin half-dollars and the gold and silver coins subsequently sold to the customers." (*Id.* ¶ 15.)

After a five-week trial, a jury found defendants guilty of both counts. The evidence at trial showed that defendants conspired to devise and implement a scheme to defraud coin purchasers of money and property by the sale of coins at highly inflated prices by means of false and fraudulent representations. The evidence also showed that defendants conspired to launder the proceeds of the illegal activity.

The evidence at trial was presented through many witnesses and exhibits. Several former customers and employees of the defendants' companies testified at trial. Defendants' motions specifically challenge the testimony of one witness, Swiatek, and one exhibit, government's exhibit 112A (hereinafter the "Valuation Chart").[3]

A. *Daubert* Hearing

On April 11, 2011, the Court held a hearing, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The following facts are taken from Swiatek's testimony at the hearing. Swiatek is employed as a professional numismatist,

---

[2] The "Subject Companies" are Wall Street Rare Coins, Atlantic Coin Galleries, Inc. ("ACG") and Northeast Gold and Silver, Inc. ("NEGS"). (Sec. Sup. Ind. ¶ 4.)

[3] Due to issues with the Valuation Chart spreadsheet there were three separate exhibits of the Valuation Chart used at trial, government's exhibits 112, 112A, and 112B. The differences in the exhibits are minimal and mainly consist of the order of the coins and slight differences in the column headings. For example, in government's exhibit 112, there is a column titled "Value at Grade Sold," and in government's exhibit 112A and 112B the corresponding column is titled "Value if on Grade." In this opinion, the Court makes reference to government's exhibit 112A, since this version of the Valuation Chart appears to be the version of the exhibit used with the witnesses at trial. In the government and defendants' briefing, the Valuation Chart is referred to as government's exhibit 112. The Court understands defendants' challenge to encompass all iterations of the Valuation Chart introduced at trial.

which he defined as "an individual who buys and sells coins." (H. 116:23-117:2.[4]) Swiatek writes books on the subject of buying and selling coins. (*Id.* 117:5-6.) Swiatek also lectures at major coin shows. (*Id.* 118:4-8.) In his work, Swiatek grades and values coins. (*Id.* 118:12-15.) Swiatek received a bachelor's degree in 1969 and a master's degree in 1973 from the City College of New York. (*Id.* 118:16-20.)

Swiatek began coin collecting as a hobby in 1952. (*Id.* 118:23-119:5.) He became a part-time coin dealer in 1971 and a full-time coin dealer in 1979. (*Id.* 119:6-14.) As a full-time numismatist, Swiatek wrote books, and wrote for Coin World, a coin industry publication. (*Id.* 119:20-22.) Swiatek studied with well-known numismatists at the time. (*Id.* 120: 2-5.)

Swiatek holds a membership with the American Numismatic Association (the "ANA"), which is the world's largest coin organization. (*Id.* 120:7-11.) In 1991, Swiatek served on the ANA Board of Governors and was appointed to a committee that handled fraud and coin improprieties. (*Id.* 120:14-18.) Swiatek served on the Board of Governors for two terms of two years per term. (*Id.* 120:17-18.) Swiatek served as Vice President and then President of the ANA. (*Id.* 120:19-23.) Swiatek is also a member of the Professional Numismatist Guild, a dealer organization. (*Id.* 121:1-4.)

Swiatek is a coin grading consultant for Numismatic Guarantee Corporation of America ("NGC"), Professional Coin Grading Service ("PCSG"), and American Numismatic Coin Grading Service. (*Id.* 121:22-122:1.) Swiatek has graded and valued at least one million coins. (*Id.* 122:2-11.)

In the coin industry, "gray sheets" are price guides, known as coin dealer newsletters, that are published once a week. (*Id.* 122:12-13; 123:13-17.) Gray sheets are wholesale pricing guides. (*Id.* 123:18-22.) Dealers use gray sheets to see the "bid ask" prices of the coins. (*Id.* 123:23-124:2.) Gray sheets can give different prices for "raw coins" which are not certified, and "slabbed coins" which are certified by a grading house.[5] (*Id.* 124:7-16.) Gray sheets are recognized in the coin industry for the approximate valuation of coins, and dealers and serious coin collectors use the gray sheets to determine the value of a coin. (*Id.* 124:17-23.)

A "blue sheet" is a certified dealer newsletter which serves as a wholesale pricing guide. (*Id.* 125:15-18; 126:15-19.) The blue sheet recognizes NGC and PCGS as the preeminent grading services in the industry. (*Id.* 127:19-21.) The blue sheet contains pricing for NGC and PCGS certified coins. (*Id.* 127:22-24.)

There are differences between the gray and blue sheets. "Blue sheet coins" do not carry a return privilege. (*Id.* 126:22-127:4.) Blue sheet pricing is also known as sight-unseen pricing. (*Id.* 127:5-7.) Coins purchased according to gray sheet pricing, however, can be viewed by the buyer prior to the purchase. (*Id.* 127:11-13.) Coins purchased according to the gray sheet also may be returned. (*Id.* 127:11-14.)

Swiatek testified that he is comfortable valuing coins that he had not seen but that were certified by PCGS or NGC. (*Id.* 128:5-9.) Swiatek explained that he was comfortable valuing these coins because

---

[4] "H." refers to the *Daubert* hearing transcript.

[5] Gray sheets also contain the following information: the type of coin, the coin's mint, the coin date, and the mint mark. (H. 124:25-125:11.)

3

PCGS and NGC are respected in the industry.[6] (*Id.* 128:10-12.)

In this action, Swiatek considered coins listed on spreadsheets that were certified by PCGS or NGC, and Swiatek valued the coins without seeing them.[7] (*Id.* 129:12-19; 130:3-4.) In assigning these values, Swiatek relied mostly on the gray sheet, but also relied upon the blue sheet and the auction prices realized.[8] (*Id.* 129:20-22.) When valuing the coins, he tried to give the higher gray sheet price in most cases. (*Id.* 130:9-12.) Swiatek utilized the blue sheet for common coins. (*Id.* 146:19-24.) The bid and ask prices from the sheets give a range, and Swiatek tried to use the ask price. (*Id.* 145:20.) If the price between the grade sold and NGC's grading was far apart, Swiatek used the bid price. (*Id.* 145:21-24.) Swiatek based the value assigned on his experience buying and selling coins. (*Id.* 146:6-7.) Swiatek also valued coins on the spreadsheet that had no grade. (*Id.* 132:5.) Swiatek was aware of the time the coins were sold, because he used gray sheets from the time sold to assign a value to the coin. (*Id.* 133:11-15.)

Swiatek never directly purchased from defendant Romano or sold coins to defendant Romano, and had no knowledge of defendant Romano's business. (*Id.* 131:4-14.) Swiatek was unaware of whether defendant Romano sold coins to wholesalers (*id.* 144:13-17), and was unaware of whether defendant Romano sold his coins sight unseen. (*Id.* 145:5-8.) Swiatek acknowledged that coin grading is subjective. (*Id.* 135:1.) Swiatek also acknowledged that where there is a raw coin, Swiatek prefers to grade the coin himself. (*Id.* 138:22-23.)

On May 4, 2011, after having conducted the *Daubert* hearing and after giving careful consideration to the written submissions and arguments of the parties, the Court issued an oral ruling permitting Swiatek's testimony. The Court found that Swiatek's testimony was relevant, and that the government had proven by a preponderance of the evidence that the testimony satisfied the requirements of *Daubert* and was properly admitted as expert testimony under the Federal Rules of Evidence. In connection with that ruling, the Court also conducted the balancing required by Rule 403 of the Federal Rules of Evidence, and determined that the testimony was not excludable under Rule 403.

### B. Trial Testimony

At trial, Swiatek testified to substantially the same facts as at the *Daubert* hearing. The government introduced the Valuation Chart during Swiatek's testimony. (T. 2027:23-2028:4.[9]) The Valuation Chart reflected Swiatek's work product from valuing the coins at NGC grade[10] and valuing the coins at the grade given by defendants.[11] (T. 2027:17-22.) In

---

[6] Swiatek is not comfortable valuing coins that had not been graded by NGC or PCGS without seeing them first. (*Id.* 128:16-129:8.)

[7] As discussed *infra*, Richard Montgomery, another expert witness in this case, testified at the hearing. Montgomery testified that he had been employed by PCGS and that he was then employed by NGC. (H. 24:11-15; 26:9-15.) Montgomery testified regarding the Sheldon Scale, the grading scale generally accepted in the coin industry. (*Id.* 29:8-21.) Montgomery also testified regarding the grading process at NGC. (*Id.* 34:14-37:7.)

[8] Swiatek used the auction price realized for coins that did not trade regularly. (*Id.* 143:3-17.)

[9] "T." refers to the trial transcript.

[10] Richard Montgomery testified at trial regarding NGC grading procedures (T. 1931:1-1932:25), the factors considered by coin graders when assigning a grade to a coin, (T. 1933:25-1934:19) and NGC's role in grading coins sold by the defendants. (T. 1947:10-1953:16.)

[11] The Valuation Chart included the following headings: NGC Invoice, Line, ACG Invoice, ACG Inv[oice] Date, Year, Mint Mark, Denom[ination],

4

constructing the Valuation Chart, Swiatek assigned a value for the coin if the coin was of the grade given by defendants (the "ACG/NEGS Grade" column) in the "Value if on Grade" column, and a value for the grade given by NGC (the "NGC Grade" column) in the "Actual Value" column. (T. 2026:24-2027:16; Gvt. Ex. 112A.) The Valuation Chart also included the price set by defendants (the "ACG/NEGS Price" column). (Gvt. Ex. 112A.)

On cross-examination, Swiatek acknowledged that he had made some errors in assigning value to certain coins. (T. 2109:7-2112:9; 2133:7-16.) In one instance, Swiatek acknowledged that he valued a walking liberty half dollar at $15 when it should have been $350. (T. 2109:7-2112:9.) On re-direct, Swiatek stated that he made errors with respect to forty-five Ben Franklin half dollars. (T. 2146:18-2147:4.) The cumulative mistakes overvalued the coins by $176.75.[12] (T. 2147:8-10.)

II. STANDARD OF REVIEW

A. Motion for Judgment of Acquittal

Motions under Rule 29(c) are governed by the same standard as motions under Rule 29(a). Pursuant to Rule 29(a), a district court shall enter a judgment of acquittal as to "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Rule 29(c) permits a defendant to "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). However, as set forth below, "'[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient.'" *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (quoting *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004)); *accord United States v. Pipola*, 83 F.3d 556, 564 (2d Cir. 1996) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)); *see also United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990) (stating that motions to challenge sufficiency of evidence "rarely carry the day").

The standard under Rule 29, as articulated by the United States Supreme Court, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *accord United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008); *Lorenzo*, 534 F.3d at 159; *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006); *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006). In other words, "'[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Temple*, 447 F.3d at 136 (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted)).

It is important to emphasize that, in evaluating the evidence under this standard, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003); *see also United States v. Florez*, 447 F.3d 145, 154-55 (2d Cir. 2006) ("In assessing sufficiency, we are obliged to view the

---

Strike, Comments, ACG/NEGS Grade, NGC MS/PF, NGC Grade, ACG/NEGS Price, Value if on Grade, and Actual Value. (Gvt. Ex. 112A.)

[12] Swiatek overvalued certain coins by $238.75 and undervalued certain coins by $62.00, which resulted in an aggregate overvaluation of $176.75. (T. 2147:8-10.)

evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court."); *Guadagna*, 183 F.3d at 130 (holding that a court must bear in mind that Rule 29 "does not provide [it] with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury" (citations and internal quotation marks omitted)).

Therefore, viewing the evidence in the light most favorable to the government means "drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Arena*, 180 F.3d 380, 391 (2d Cir. 1999) (citation and internal quotation marks omitted); *accord United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000) ("[T]he credibility of witnesses is the province of the jury, and [a court] simply cannot replace the jury's credibility determinations with [its] own." (citation and internal quotation marks omitted)). In examining the sufficiency of the evidence, the Court also should not analyze pieces of evidence in isolation, but rather must consider the evidence in its totality. *See United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993); *see also Guadagna*, 183 F.3d at 130 (holding that sufficiency test must be applied "to the totality of the government's case and not to each element, as each fact may gain color from others"). Finally, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" *Lorenzo*, 534 F.3d at 159 (quoting *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)); *see also Irving*, 452 F.3d at 117 ("A jury may convict on circumstantial evidence alone."); *accord Jackson*, 335 F.3d at 180; *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). However, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (citation and internal quotation marks omitted); *accord United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005).

In short, "'[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *Temple*, 447 F.3d at 137 (quoting *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks omitted; alteration in original)). On the other hand, "'in passing upon a motion for directed verdict of acquittal, . . . if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted.'" *Temple*, 447 F.3d at 137 (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)).

B. Motion for a New Trial

Rule 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a Rule 33 motion only in "extraordinary circumstances," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (citation and internal quotation marks omitted), and only if there exists "'a real concern that an innocent person may have been convicted.'" *United States v.*

*Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d. Cir. 2001)); *accord United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009); *see also United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution."). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134.

III. DISCUSSION

A. Admissibility of Swiatek's Testimony

Prior to trial, the Court concluded that Swiatek's expert testimony was admissible at trial. As discussed below, Swiatek's testimony met all of the requirements set forth under *Daubert*. Swiatek's testimony was relevant, and its highly probative value was not substantially outweighed by the danger of unfair prejudice or any of the other considerations of Rule 403. As such, the admission of Swiatek's testimony does not warrant a judgment of acquittal or a new trial.

1. Admissibility Under *Daubert*

a. Applicable Law

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, under Rule 702, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact. *See Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005).

Under the *Daubert* standard, a court must first determine whether the expert has sufficient qualifications to testify before proceeding to the remaining factors. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (stating that, where the witness lacked qualifications, an analysis of the remaining *Daubert* factors "seems almost superfluous"). Specifically, under Rule 702, the Court must determine whether the expert is qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A court should look at the totality of the witness' qualifications in making this assessment. *See, e.g.*, *Rosco, Inc. v. Mirror Lite Co.*, 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007) ("A court must consider the 'totality of a witness'[ ] background when evaluating the witness'[ ] qualifications to testify as an expert." (quoting 29 Wright & Gold, Fed. Prac. & Proc. § 6265, at 246 (1997))); *accord Keenan v. Mine Safety Appliances Co.*, No. CV-03-0710 (TCP)(ARL), 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006). In addition, the Court must ensure that the expert will be proffering opinions on issues or subject matter that are within his or her

7

area of expertise. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80-82 (2d Cir. 1997); *see also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. Dec. 13, 2007) ("Testimony on subject matters unrelated to the witness'[ ] area of expertise is prohibited by Rule 702.").

With respect to reliability, "'the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). Moreover, in addition to these criteria for determining whether the methodology is reliable, Rule 702 also requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

With respect to whether the expert's testimony will assist the trier of fact, the Second Circuit has repeatedly emphasized that "expert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in apply that law to the facts before it, . . . by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely*, 414 F.3d at 397 (citations and quotation marks omitted).

The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence standard. *See Daubert*, 509 U.S. at 593 n.10. ("These matters should be established by a preponderance of proof." (citing *Bourjaily v. United States*, 483 U.S. 171, 175-75 (1987))); *see also* Fed. R. Evid. 702 advisory committee's note (2000) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

b. Analysis

i. Swiatek's Qualifications

To the extent defendants argue that Swiatek's testimony should have been excluded because he is unqualified, the Court disagrees. Swiatek has been self-employed as a numismatist since 1971 and has been a full-time numismatist since 1979. (H. 119:6-14.) Swiatek studied with leading numismatists to learn his craft. (*Id.* 120:2-5.) Swiatek has written for coin publications and has published books on coins. (*Id.* 117:5-6, 119:20-22.) Swiatek has served as the president of the American Numismatic Association, and continues to serve as a member of that organization. (*Id.* 120:1-23.) Swiatek has served as an expert in another

case involving criminal prosecution for mail fraud relating to coin sales. *See United States v. Numisgroup Int'l Corp.*, 170 F. Supp. 2d 340, 346-47 (E.D.N.Y. 2001), *aff'd* 368 F.3d 880 (2d Cir. 2004), *rev'd sub nom. on other grounds*, *Dupurton v. United States*, 543 U.S. 1098 (2005). Based on Swiatek's experience, the Court concludes that Swiatek was sufficiently qualified to render an expert opinion regarding coin valuation.

ii. Swiatek's Data and Methodology

Defendants attack the admissibility of Swiatek's testimony under the second prong of the *Nimely* inquiry, arguing that his opinion is not based upon a consistent and objective methodology.

Defendants' argument regarding the reliability of Swiatek's data and methodology touches on the coin grading and valuation industry as a whole. Defendants have argued, as a threshold matter, that the industry of coin grading and valuation are too subjective to be the proper basis for expert testimony. Having conducted the *Daubert* hearing, the Court disagrees. Instead, the Court finds that the testimony of Swiatek and another expert, Montgomery, demonstrated that the system for coin grading and valuation rests on well-established industry standards, publications and market trends, which are sufficiently reliable to form the basis of expert testimony. Although it is uncontroverted that there is a subjective component to grading and valuation, that subjective component does not render the expert testimony as unreliable given the widely-accepted grading standards and valuation publications utilized in the industry to determine the current market value of coins.

The Court's conclusion is consistent with other courts, including the Second Circuit, that have allowed expert testimony in the coin grading and valuation fields. *See United States v. Kayne*, 90 F.3d 7, 12 (1st Cir. 1996) ("One could hardly expect a lay jury to form conclusions about such an esoteric subject as the value of rare coins without the help of experts."); *United States v. Numisgroup Int'l Corp.*, 368 F.3d 880 (2d Cir. 2004), *rev'd sub nom. on other grounds*, *Dupurton v. United States*, 543 U.S. 1098 (2005) (affirming the district court's judgment and noting that the district court stated "while subjectivity in the grading process may justify some variation in grading, this subjectivity factor cannot account for the huge differential in the grading and value of the coins." (internal quotations omitted)); *U.S. v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986) (noting that the coin grading process is inherently subjective, but finding that official grading standards have wide acceptance in the industry and gray sheets are "almost universally relied upon by dealers to determine current market value of coins.").

In fact, in *Numisgroup Int'l Corp.*, the Second Circuit rejected challenges to the sufficiency of the evidence and affirmed the conviction based upon, *inter alia,* the same two experts who testified in the this case – namely, Montgomery and Swiatek. The Second Circuit explained:

> This case involves the question of whether the presence of objective and subjective grading factors immunizes a seller of coins from a criminal charge of fraudulently misrepresenting the grade and value of coins to purchasers. While noting the existence of a number of objective, established grading factors, the district court determined that the Government had sufficiently shown, beyond a reasonable doubt, "that while subjectivity in the

grading process may justify some variation in grading, this subjectivity factor cannot account for the huge differential in the grading and value of the coins." *United States v. Numisgroup Int'l, Corp.*, 170 F. Supp. 2d 340, 351 (E.D.N.Y. 2001). The Court concluded that a reasonable jury could have found the essential elements of mail fraud based on the intentional, systematic overgrading, beyond a reasonable doubt.

We AFFIRM the judgment of the District Court for substantially the reasons stated by the District Court in its thorough decision . . . .

368 F.3d at 880 (citation omitted). Similarly, in the instant case, this Court concluded that the methodology for grading and valuation in the coin industry, upon which the experts in this case based their opinions, are sufficiently reliable to be the proper subject of expert testimony notwithstanding their subjective elements.[13]

With respect to Swiatek's testimony in particular, the Court found that Swiatek's method for assigning a value to the coins at issue was based on Swiatek's experience in the coin industry and reliable data, namely, the gray sheets, blue sheets, auction prices, and in most instances, grades assigned by national coin grading services. Defendants' objections to Swiatek's testimony went to the weight, rather than the admissibility. *See Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005) ("Defendants are free to challenge the basis and source for [the proposed expert's] numbers, but a challenge to the facts or data relied upon by [the proposed expert] does not go to the admissibility of his testimony, but only to the weight of his testimony." (citing *Concise Oil & Gas P'ship v. Loisiana Interstate Gas Corp.*, 986 F.2d 1463, 1476 (5th Cir. 1993))); *MacQuesten Gen. Contracting, Inc. v. HCE, Inc.*, No. 99 Civ. 8598 (JCF), 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002); *see also Amerisource Corp. v. RX USA Int'l., Inc.*, No. 02 Civ. 2514 (JMA), 2008 WL 2783355, at *2 (E.D.N.Y. July 15, 2008). Although defendants highlighted potential flaws in Swiatek's methodology, such as choosing between the gray and blue sheets and selecting values from a range, there was sufficient indicia of reliability to allow admission of his testimony, and "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof" were the proper means for the jury to evaluate these issues in this particular case. *Daubert*, 509 U.S. at 596; *accord Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (noting that *Daubert* "advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable"); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (D. Vt. 1995) (district court did not abuse its discretion in admitting expert testimony where "[d]isputes as to the strength of his credentials, faults in his use

---

[13] To the extent defendants argue that coin grading and valuation have become less reliable in recent years, the Court notes that the Second Circuit affirmed the District Court's decision to allow Swiatek's testimony in *Numisgroup Int'l Corp.* in 2004. In addition, Swiatek and Montgomery testified before this Court to current established standards in the coin industry, which this Court finds continue to be sufficiently reliable to form the basis of expert testimony. Although defendants have argued that certain publications have opined on the subjectivity and swings in coin grading (Defs.' Mem. of Law at 10-11, Nov. 19, 2010, ECF No. 175), these articles do not establish that expert testimony in coin grading and valuation should be barred. Instead, given the sufficient reliability of the methodology, these articles go to the weight of the testimony in this area of expertise under the particular facts of each individual case, not the admissibility.

of differential etiology as methodology, or lack of textual authority for his opinion, [went] to the weight, not the admissibility, of his testimony."). *But see Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."). The Court also recognizes that Swiatek acknowledged errors in his valuation at trial; however, this went to the weight the jury was to assign to Swiatek's testimony rather than to its admissibility. In short, the Court found that Swiatek's testimony was grounded in sufficient facts and data, his testimony was the product of reliable principles and methods, and Swiatek applied these principles and methods reliably to the facts of this case.

iii. Swiatek's Assistance to the Trier of Fact

Though most of defendants' objections to Swiatek's testimony relate to his methodology, defendants also argue that Swiatek's testimony was inappropriate to the facts of the case. (Defs.' Letter Motion for Acquittal at 3, July 29, 2011, ECF No. 297.) The Court undertook an analysis of Swiatek's testimony to determine if it assisted the jury in deciding the issues of this case. The Court found that Swiatek's testimony did not usurp the Court or jury's role or attempt to tell the jury which conclusion to reach. Swiatek's testimony was relevant to the facts of the case and unquestionably was necessary to assist the jury in deciding whether the government had met its burden on the essential elements of the crimes. Specifically, Swiatek's testimony provided highly probative evidence to assist the jury in assessing, *inter alia*, whether certain statements by the defendants regarding the grades and valuation of coins were false, and whether any misrepresentations were material.

2. Admissibility Under Rule 403

As set forth below, the Court also found that Swiatek's testimony satisfied the Rule 403 balancing and, thus, that there was no basis to exclude his testimony under that Rule.

a. Applicable Law

Pursuant to Rule 402 of the Federal Rules of Evidence, all relevant evidence is admissible unless specifically excluded. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401; *see United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime.") Relevant evidence, however, may be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Therefore, the Court must perform a Rule 403 balancing test prior to the admission of relevant evidence.

b. Analysis

Defendants argue that Swiatek's method of coin valuation should not have been admitted because of the subjectivity in coin grading and the degree to which the coins in this case fall within the margin of error for

the grading analysis. *See* Defs.' Post Hearing Mem. of Law at 12, April 26, 2011, ECF No. 241; Defs.' Letter Motion for Acquittal, July 29, 2011, ECF No. 297. Defendants argue that Swiatek's testimony had limited to no probative value, and was highly prejudicial. *See* Defs.' Post Hearing Mem. of Law at 12, April 26, 2011, ECF No. 241; Defs.' Motion for Acquittal, July 29, 2011, ECF No. 297.

As discussed *supra*, Swiatek's testimony was based on reliable data and methodology and was clearly relevant evidence to the crimes alleged in this case. With respect to the requisite Rule 403 balancing, the Court viewed Swiatek's testimony as highly probative to the crimes charged in the indictment. Swiatek's testimony was relevant to issues of coin industry standards and practices, the intent of the defendants, and the materiality issue regarding grades, among other issues. Swiatek's testimony was not unduly prejudicial, and, as discussed *infra*, the Court issued an appropriate limiting instruction concerning the proper use of the Valuation Chart.

In sum, Swiatek's testimony satisfied the requirements of Federal Rule of Evidence 702, within the framework established by *Daubert*, and also satisfied the Rule 403 balancing test. Accordingly, the challenges to the testimony of Swiatek do not warrant a judgment of acquittal or a new trial.

B. Admissibility of the Valuation Chart

Defendants argue that the admission of the Valuation Chart violated Rule 403 of the Federal Rules of Evidence. Defendants argue that the Valuation Chart suggested that, even if the defendants had properly graded the coins, they were selling the coins at inflated prices.[14] (Defs.' Letter Motion for Acquittal at 5, July 29, 2011, ECF No. 297.) During the course of the trial, the Court explained in great detail the reasons that the chart was admissible. (T. 2036-37; 2056-57; and 2572-73.) For the reasons set forth below, as well as on the record during the trial, the Valuation Chart was properly admitted, and does not provide a basis for a judgment of acquittal or a new trial.

The Court applied the standard set forth *supra* Section III.A.2.a and concluded that the Valuation Chart was highly probative, and its probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by consideration of undue delay, waste of time or needless presentation of the evidence.

The Valuation Chart was highly probative of critical issues in the case. First, the Valuation Chart was probative of the government's theory of the case that the defendants did not actually grade the coins and that the defendants assigned arbitrary grades to the coins. The Valuation Chart was used to show, among other things, that some of the defendants' prices for the coins had no correlation to the grades that were assigned by defendants to the coins, which would suggest that the grades given by defendants were arbitrarily assigned. Of course, by allowing the government to demonstrate that the grading was arbitrary, the Valuation Chart also provided evidence

---

[14] The Valuation Chart included the defendants' price for the coin and the value of the coin at the grade supplied by defendants. In many instances, the price charged for the coin was higher than the value of the coin at the grade supplied by defendants. (Gvt. Ex. 112A.) Defendants argue that "as a result of this evidence the jury could infer that the defendants were guilty of fraud based upon the prices charged for the coins even if they jury found that the coins were graded [by defendants] in good faith." (Defs.' Letter at 2, Aug. 11, 2011, ECF No. 300.)

on the issue of whether the misrepresentations regarding grading and value were knowingly and intentionally made.

Second, the Valuation Chart was probative to the materiality of other misrepresentations that were made by defendants. For instance, the Superseding Indictment alleges that the defendants and those acting at their direction encouraged customers to build sets of coins and represented that they knew of other purchasers who had sold similar gold or silver coin sets for a profit. (Sec. Sup. Ind. ¶ 13.) The Superseding Indictment also alleges that defendants and those acting at their direction represented to customers that they would assist the customers with the sale of the coins or sell the coins on their behalf at a coin show. (*Id.*) The Valuation Chart was used to show that these misrepresentations were material, because even if the coin was properly graded, the customer actually often purchased a coin that was worth well below the price proffered by defendants and those acting at their direction.

In addition, the danger of prejudice was minimized by the Court's extensive limiting instruction regarding the Valuation Chart. *See U.S. v. Abu-Jihaad*, 630 F.3d 102, 132-33 (2d Cir. 2010) ("In any event, the district court properly minimized the risk of unfair prejudice through limiting instructions."). At the conclusion of defendants' case, the Court instructed the jury,

> Members of the jury, I'm going to give you another limiting instruction regarding Government Exhibit 112 in evidence, a particular column in the exhibit I will be referring to[,] that you recall it was a Swiatek valuation analysis chart[,] and I'm going to give you an instruction.
> 
> Government Exhibit 112, the Swiatek valuation analysis chart contains a column labeled value if on grade. According to his testimony, this column represents Mr. Swiatek's expert opinion regarding the value of the coins, if NGC had graded the coin at the same level as the grade that appears on the invoice of the subject company.
> 
> The results of Mr. Swiatek's analysis are then summarized in Government Exhibit 122. A summary chart introduced during the testimony of Postal Inspector Hessle.
> 
> First of all, you must evaluate the information contained in this chart and all of Mr. Swiatek's testimony in accordance with the instructions I have given you regarding expert testimony and I will repeat those instructions at the conclusion of the case.
> 
> Secondly, I must advise you that even if you should determine that in some cases the amount the subject companies charged customers for coins exceeded Mr. Swiatek's value for those coins, you may not convict the defendant you are considering of the charges contained in the indictment unless all of the elements of the crimes charged have been proven beyond a reasonable doubt.
> 
> The government does not allege that the defendants engaged in criminal conduct merely because they allegedly charged more for certain coins than their actual value in the opinion of the expert witness. This evidence was offered for your consideration in connection with the issues of, one, the materiality of any

13

allegedly false or misleading statements or representations made to customers, and two, whether or not the alleged misrepresentation was knowingly and intentionally made by the defendant you are considering.

That concludes that limiting instruction.

(T. 2618:10-2619:24.) The Court's instruction closely mirrored the defendants' proposed instruction on the Valuation Chart, which defendants submitted after discussion with the Court. (Proposed Charge, June 3, 2011, ECF No. 280; T. 2572:4-2573:24.) With this limiting instruction, the Court minimized any risk of unfair prejudice caused by the Valuation Chart.

Defendants argue that under *United States v. Ferguson*, 653 F.3d 61 (2d Cir. 2011), *amended and superseded by* --- F.3d ----, 2011 WL 6351862 (2d Cir. Dec. 19, 2011), the admission of the Valuation Chart warrants a judgment of acquittal or a new trial. (Defs.' Letter, Aug. 8, 2011, ECF No. 300.) In *Ferguson*, several defendants were convicted of conspiracy, mail fraud, securities fraud, and making false statements to the Securities and Exchange Commission. The charges arose from defendants' involvement in an allegedly fraudulent insurance transaction between American International Group, Inc. ("AIG") and Gen Re Corporation. At trial, the government introduced three charts which showed AIG stock prices in the days following news articles regarding the sham transaction in order to show the materiality of the transaction-related misstatements. 2011 WL 6351862, at *6.[15] The Second Circuit found that the charts were prejudicial "because the [transaction] was one of several problems besetting AIG at that time. Unrelated allegations of bid-rigging, improper self-dealing, earnings manipulations, and more, had to be redacted from the articles about the [transaction], to avoid prejudicing the defendants." *Id.* at *7.

*Ferguson* is distinguishable from the present case for four principal reasons. First, the Second Circuit determined that the charts in *Ferguson* were misleading to the jury due to the other factors that adversely affected AIG stock price. Here, the Valuation Chart was not misleading, and defendants had a full and fair opportunity to address all of the factors that may have affected the numbers in the Valuation Chart. Second, although the charts were admitted to show materiality in *Ferguson*, the Second Circuit concluded that the government exploited the evidence in the charts to "emphasize the losses caused by the transaction" and "humanize its prosecution." *Id.* The Second Circuit noted that the defendants had offered to stipulate to materiality, but the government refused in order to present a coherent narrative of the case. *Id.* The Second Circuit found that the prosecutor's comments went beyond the presentation of a coherent narrative of the case. *Id.* Here, the prosecutor's comments in summation[16] did not unfairly emphasize the loss caused by defendants or attempt to humanize the government's prosecution, but rather properly emphasized the many misrepresentations made by defendants and those acting at their direction in their sales pitches to customers.[17] Third, it does not appear that the district court in *Ferguson*

---

[15] The Court cites to the amended decision in *Ferguson*, which was issued after defendants' letter and the government's response.

[16] In rebuttal summation in the present case, the prosecutor offered a "real Ben Franklin half dollar roll pitch." (T. 2867:21.)

[17] The Court notes that the defendants did not offer to stipulate to the materiality of the alleged misrepresentations in the present case.

14

gave a limiting instruction regarding the charts, whereas in the present case, the Court gave an extensive limiting instruction regarding the proper use of the Valuation Chart. Finally, the charts in *Ferguson* only were admitted to show materiality, and there were other avenues available to the government to show materiality, in addition to the defendants' proposed stipulation. *Id.* at *8 ("If no offer to stipulate were forthcoming, the government could have relied upon the sufficiency of its other materiality evidence or offered expert testimony about the [transaction's] effect on the stock price." (footnote omitted)). Here, in addition to demonstrating materiality, the Valuation Chart was highly probative of the government's claim that the defendants did not grade the coins they sold. The arbitrariness between the defendants' price, defendants' grade and the value if on grade proffered by defendants strongly suggested that defendants did not grade the coins at all, and knowingly and intentionally misrepresented their grading activities. Thus, *Ferguson* is clearly distinguishable from the facts of this case, and does not provide any legal support for defendants' arguments for a new trial or a judgment of acquittal.

The Court also considered the other factors set forth for Rule 403 balancing and concluded that the extremely high probative value of the Valuation Chart was not substantially outweighed by confusion of the issues, misleading the jury, or by consideration of undue delay, waste of time or needless presentation of the evidence. The Valuation Chart was properly admitted under Rule 403. As such, the admission of the Valuation Chart does not warrant a judgment of acquittal or a new trial.

C. Claim of Constructive Amendment/Prejudicial Variance

The defendants argue that there was a constructive amendment to the Superseding Indictment because the Valuation Chart suggested that, even if the defendants had properly graded the coins, they were selling the coins at inflated prices. (Defs.' Letter Motion for Acquittal at 5, July 29, 2011, ECF No. 297.) In the alternative, defendants argue that this expansion of the theory of guilt represented a prejudicial variance. (*Id.*)

As set forth below, as well as on the record at trial (T. 2054-57), this argument is unavailing. The Valuation Chart was highly probative of the allegations set forth in the Superseding Indictment, as discussed *supra*, and was not a constructive amendment or variance from the Superseding Indictment.

1. Applicable Law

The Fifth Amendment grants defendants the right to be tried only on charges contained in an indictment returned by a grand jury. "An unconstitutional amendment of the indictment occurs when the charging terms are altered, either literally or constructively." *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir. 1994); *see United States v. Mucciante*, 21 F.3d 1228, 1233 (2d Cir. 1994) ("Even if an indictment is not *actually* amended, the law recognizes that there are times when the government's presentation of evidence, together with the trial court's jury instructions, creates an unacceptable risk that the jury might convict the defendant of a crime materially different from the one alleged in the indictment.").

An indictment has been constructively amended "when the government's presentation of evidence and the district court's jury instructions combine to 'modify

essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury.'" *United States v. Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir. 1996) (quoting *Clemente*, 22 F.3d at 482).

An *amendment* of the indictment occurs when the terms of the indictment are altered – literally, or in effect – *after* the grand jury has passed upon them. *See United States v. Frank*, 156 F.3d 332, 338 n.5 (2d Cir. 1997). By contrast, "[a] *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Id.* (quoting *U.S. v. Zingaro*, 858 F.2d 94, 98 (2d Cir. 1988)). The most significant difference between a variance and a constructive amendment is that the latter is a *per se* violation of the Fifth Amendment, whereas "a defendant must show prejudice in order to prevail on a variance claim." *Id.* A defendant will fail to show that he has been prejudiced by the variance when "the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Mucciante*, 21 F.3d at 1236 (citation and internal quotation marks omitted).

### 2. Relevant Facts

As set forth *supra*, for nearly every coin, the Valuation Chart included the defendants' price ("ACG Price"), the value of the coin if it was the grade proffered by defendants ("Value if on Grade"), and the actual value of the coin based on the NGC grade ("Actual Value"). (Gvt. Ex. 112A.)

In some instances, the defendants' price for the coin far exceeded the value of the coin, even if the coin were of the grade proffered by defendants. At trial, the government highlighted, *inter alia*, a coin that defendants priced at $13,500, but would have only been worth $2,350 if the coin was of the grade proffered by defendants. (T. 2033:17-2034:10; Gvt. Ex. 112A at 3, line 71.) The actual value of the coin at the NGC grade was $1,950. (Gvt. Ex. 112A at 3, line 71.)

In other instances, however, the defendants' price for the coin was below the value of the coin if the coin were of the grade proffered by defendants. At the trial, the government also highlighted a coin that defendants priced at $8,000, but would have been worth $11,000 if the coin was of the grade proffered by defendants. (T. 2029:14-2030:3; Gvt. Ex. 112A at 1, line 41.) The actual value of the coin at the NGC grade was $400. (Gvt. Ex. 112A at 1, line 41.)

As noted *supra*, the Court gave an extensive limiting instruction regarding the Valuation Chart.

### 3. Application

The Court finds that the admission of the Valuation Chart did not constitute a constructive amendment or prejudicial variance of the Superseding Indictment.

First, there was no constructive amendment of the Superseding Indictment because there was no "substantial likelihood" that the defendants were convicted of offenses other than the offenses charged in the Superseding Indictment. *See Vebeliunas*, 76 F.3d at 1290. Although the Valuation Chart included prices for the coins at the grades proffered by defendants, the government never suggested at trial that defendants could be found guilty merely for

over-charging customers for properly graded coins. As noted *supra*, the Valuation Chart was highly probative to the government's theory that defendants never graded the coins, despite their representations to customers that they had done so. In addition, the Valuation Chart was probative of the materiality of the misrepresentations made by defendants as alleged in the Superseding Indictment, as well as the knowing and intentional nature of the fraudulent conduct. In the Court's limiting instruction, the Court emphasized:

> Secondly, I must advise you that even if you should determine that in some cases the amount the subject companies charged customers for coins exceeded Mr. Swiatek's value for those coins, you may not convict the defendant you are considering of the charges contained in the indictment unless all of the elements of the crimes charged have been proven beyond a reasonable doubt.
>
> The government does not allege that the defendants engaged in criminal conduct merely because they allegedly charged more for certain coins than their actual value in the opinion of the expert witness. This evidence was offered for your consideration in connection with the issues of, one, the materiality of any allegedly false or misleading statements or representations made to customers, and two, whether or not the alleged misrepresentation was knowingly and intentionally made by the defendant you are considering.

(T. 2619:7-23.) In short, it was abundantly clear to the jury that there was no allegation in the Superseding Indictment, or anywhere else, that defendants merely overcharged their customers or could be convicted merely for over-charging their customers.

For the same reasons, there was no prejudicial variance. As noted above, the government offered no evidence or argument that defendants could be convicted of overcharging customers for properly graded coins. The Valuation Chart and the government's other evidence related solely to the charges in the Superseding Indictment – namely, that defendants made false statements regarding grade and value of coins, the employment of in-house graders, and other material misrepresentations. Thus, the Valuation Chart and other evidence at trial did not prove facts materially different from those alleged in the Superseding Indictment.

### D. *Daubert* Motion Regarding Richard Montgomery

With respect to defendants' pre-trial motion to preclude the testimony of Richard Montgomery, the Court concluded prior to trial that Montgomery's testimony satisfied the *Daubert* requirements. Though defendants do not argue that Montgomery's testimony warrants a judgment of acquittal or a new trial, the Court supplements its May 4, 2011 ruling allowing Montgomery's testimony herein.

For defendants' *Daubert* challenge, the Court applied the standard set forth *supra* Section III.A.1.a. The Court found that Montgomery satisfied all of the requirements set forth in Federal Rule of Evidence 702. Specifically, the Court found that Montgomery was qualified as an expert in the area of coin grading, Montgomery's opinion was based upon reliable data and methodology and his testimony would assist the trier of fact.

Montgomery has substantial qualifications in the area of coin grading, and was at the time of the hearing the president of NGC. (H. 20:21-22.) Montgomery began his career at ANA in 1980, and became an authenticator and grader for ANA and a division of ANA that graded coins, the American Numismatic Association Certification Service ("ANACS"). (*Id.* 21:3-6; 22:8-23:23:7.) Montgomery became the director of ANACS in 1985 and continued to grade and authenticate coins in that capacity. (*Id.* 23:17-24:2.) Montgomery worked at PCGS beginning in 1987 as a coin grader, and graded coins until 2002. (*Id.* 24:11-13, 24:25-25:3.) Montgomery then began work at NGC as a grader and authenticator. (*Id.* 26:8-19.) From 2002 to 2006, Montgomery graded approximately one thousand coins per day. (*Id.* 26:23-25.) Montgomery became the President of NGC in 2006. (*Id.* 27:1-3.)

Montgomery's testimony regarding the grading of coins in general and the grading of coins at issue in this case was based upon reliable data and methodology. As noted *supra*, the Court concluded that the system for coin grading and valuation rests on well-established industry standards, publications and market trends, which are sufficiently reliable to form the basis of expert testimony. With respect to Montgomery's testimony regarding the grading process, Montgomery explained the process for grading coins at NGC, (*Id.* 34:14-37:7), and the components of coin grading in the mint state category: luster, contact marks, strike quality, and eye appeal. (H. 40:20-41:3.) Montgomery's testimony regarding the components of coin grading also was accepted by the District Court in *U.S. v. Numisgroup Int'l Corp.* 170 F. Supp. 2d 340 346-47 (E.D.N.Y. 2001) *aff'd* 368 F.3d 880 (2d Cir. 2004), *rev'd sub nom. on other grounds*, *Dupurton v. United States*, 543 U.S. 1098 (2005) ("Montgomery described the grading structure of coins within the industry and indicated that a coin is graded based on the following four primary components: (i) luster: meaning the original brilliance of the coin; (ii) contact marks: meaning the degree of contact marks a coin has incurred when "dinged," nicked, or scratched, for example, by another coin; (iii) strike: based on how well the blank coin face came together with the dye used during minting, and how detailed and defined is the design on both sides of the coin; and (iv) eye appeal: meaning the coin's overall attractiveness particularly in regard to toning and coloration."). Montgomery testified regarding the Sheldon Scale for coin grading, which categorizes coins on a scale of one to seventy. (H. 29:11-16.) The Sheldon Scale is generally accepted in the coin industry and has been used for approximately sixty years. (*Id.* 29:8-12; 29:17-21.) To the extent there is some subjectivity in coin grading, this went to the weight and not the admissibility of Montgomery's testimony. Montgomery credibly testified that although coin graders may have disagreements about the grade of a coin, which may result in small deviations in grading, it is rare to have widely divergent grading by coin professionals because of well-established industry standards. (*Id.* 48:8-49:14.) For these reasons and the reasons noted *supra*, the Court concluded that Montgomery's testimony was based upon reliable data and methodology.

The Court also found that Montgomery's testimony would assist the trier of fact. The testimony was relevant to the facts of the case and unquestionably was necessary to assist the jury in deciding whether the government had met its burden on the essential elements of the crimes. Specifically, Montgomery's testimony provided highly probative evidence to assist

the jury in assessing, *inter alia*, whether certain statements by the defendants regarding the grades of coins were false, and whether any misrepresentations were material.

In addition, the Court conducted the requisite Rule 403 balancing test and concluded that Montgomery's testimony was highly relevant for the reasons set forth above, and its probative value was not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

### IV. CONCLUSION

For the reasons set forth above, the defendants' motion for a judgment of acquittal and motion for a new trial are denied in their entirety. In addition, for the reasons set forth on the record (as supplemented by this Memorandum and Order), defendants' *Daubert* motions, seeking to preclude the testimony of Anthony Swiatek and Richard Montgomery, are denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 3, 2012
   Central Islip, NY

\* \* \*

The attorney for the government is Loretta E. Lynch, United States Attorney, by Lara Treinis Gatz and Thomas M. Sullivan, Assistant United States Attorneys, 610 Federal Plaza, Central Islip, New York 11722. Defendant Michael Romano is represented by Maurice H. Sercarz and Diane Ferrone, Sercarz & Riopelle LLP, 152 West 57th Street, 24th Floor, New York, New York 10019. Defendant William Kearney is represented by Michael Bachner, Bachner & Herskovits, P.C. 26 Broadway, Suite 2310, New York, New York 10004.